_____

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

_____

JOHN ALLEN RUBIO,

*Petitioner-Appellant*

V.

BOBBY LUMPKIN, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

*Respondent-Appellee*

_____

On Appeal from the United States District Court for the Southern District of Texas, Brownsville Division, No. 1:18-cv-00088

_____

## MOTION FOR CERTIFICATE OF APPEALABILITY AND BRIEF IN SUPPORT

Lee Kovarsky
*Special Counsel*

Phillips Black, Inc.
A Non-Profit Law Practice
727 E. Dean Keeton Street
Austin, Texas 78705
434.466.8257
l.kovarsky@phillipsblack.org

Jeremy Schepers
Supervisor, Capital Habeas Unit
jeremy_schepers@fd.org

Derek VerHagen
Assistant Federal Public Defender
derek_verhagen@fd.org

Claire Davis
Assistant Federal Public Defender
claire_davis@fd.org

Office of the Federal Public Defender
Northern District of Texas
525 South Griffin Street, Ste. 629
Dallas, Texas 75202
214.767.2746
214.767.2886 (fax)

## STATEMENT REGARDING ORAL ARGUMENT

This is a capital case with significant and nuanced constitutional claims, an issue that could create a circuit split, and an expansive record. Rubio requests the opportunity to present oral argument and answer any questions this Court might have, which will aid this Court in resolving this case.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ................................... I

TABLE OF CONTENTS .......................................................... II

TABLE OF AUTHORITIES..................................................... IV

MOTION FOR CERTIFICATE OF APPEALABILITY........................... 1

BRIEF IN SUPPORT OF MOTION FOR CERTIFICATE OF
APPEALABILITY .............................................................. 2

STATEMENT OF THE CASE ................................................... 2

   I.    The crime............................................................. 2

   II.   Trials and direct review. ............................................ 6

   III.  State post-conviction proceedings................................. 9

   IV.  Federal habeas and exhaustion proceedings.................... 10

STANDARD OF REVIEW...................................................... 11

ARGUMENT .................................................................... 12

   I.    This Court should certify for appeal Rubio's claim that his Sixth
Amendment right to counsel was violated because the defense
failed to reasonably investigate Rubio's prenatal exposure to
alcohol........................................................... 12

      A. Reasonable jurists could debate the claim's underlying
merit......................................................... 13

         1. Trial counsel was deficient. ............................... 13

         2. The deficiency was prejudicial. .......................... 21

      B. Reasonable jurists could debate whether § 2254(d) restricts
relief. ....................................................... 27

         1. Reasonable jurists could debate whether Rubio satisfies
§ 2254(d)(2), an argument the district court wholly failed
to address. ............................................... 28

         2. Reasonable jurists could debate whether Rubio satisfies
§ 2254(d)(1). ............................................. 33

   II.   This Court should certify for appeal Rubio's claim that his Sixth
Amendment right to counsel was violated because the defense
failed to investigate and prepare for his insanity defense......... 43

A. Reasonable jurists could debate the claim's underlying merit...................................................................... 43

1. Reasonable jurists could debate whether trial counsel's preparation for the guilt phase was deficient. ................ 44

a. Failure to prepare insanity experts. ............................ 45

b. Failure to investigate TDCJ records documenting history of mental illness. .............................................. 50

2. Reasonable jurists could debate whether the deficiencies prejudiced Rubio. ............................................................. 53

B. Reasonable jurists could debate whether default is excused…. ............................................................................... 56

III. This Court should certify for appeal Rubio's claim that the State violated his right to due process under *Napue v. Illinois*. ......... 58

A. Reasonable jurists could debate the claim's underlying merit...................................................................... 58

1. Reasonable jurists could debate whether the State knowingly elicited false testimony from Dr. Welner. ..... 59

2. Reasonable jurists could debate whether the State knew, or should have known, that Dr. Welner's testimony was false. ................................................................................... 63

3. Reasonable jurists could debate whether Dr. Welner's false testimony was material. .......................................... 63

B. Reasonable jurists could debate the district court's procedural ruling on Rubio's false testimony claim ............. 64

CONCLUSION ......................................................................................... 67

CERTIFICATE OF SERVICE .................................................................. 68

CERTIFICATE OF COMPLIANCE ......................................................... 68

# TABLE OF AUTHORITIES

**Federal Cases**                                                    **Page(s)**

*Bailey v. Rae,*
  339 F.3d 1107 (9th Cir. 2003) ............................................................. 37

*Carusone v. Warden, N. Cent. Corr. Inst.,*
  966 F.3d 474 (6th Cir. 2020) ................................................................ 37

*Castro v. Oklahoma,*
  71 F.3d 1502 (10th Cir. 1995) ............................................................. 27

*Charles v. Stephens,*
  736 F.3d 380 (5th Cir. 2013) ......................................................... 37, 38

*Druery v. Thaler,*
  647 F.3d 535 (5th Cir. 2011) ............................................................... 55

*Gonzales v. Stephens,*
  606 F. App'x 767 (5th Cir. 2015) ................................................... 34, 35

*Hinton v. Alabama,*
  571 U.S. 263 (2014) ............................................................................ 47

*Kyles v. Whitley,*
  514 U.S. 419 (1995) ............................................................................ 49

*Long v. Hooks,*
  972 F.3d 442 (4th Cir. 2020) ............................................................... 36

*Lucio v. Lumpkin,*
  987 F.3d 451 (5th Cir. 2021) ............................................................... 39

*Martinez v. Ryan,*
  566 U.S. 1 (2012) ................................................................................ 57

*Miller-El v. Cockrell,*
  537 U.S. 322 (2003) ............................................................................ 12

*Nelson v. Davis,*
  952 F.3d 651 (5th Cir. 2020)............................................................ 12

*Porter v. McCollum,*
  558 U.S. 30 (2009)........................................................................... 21

*Rompilla v. Beard,*
  545 U.S. 374 (2005)................................................................. *passim*

*Sears v. Upton,*
  561 U.S. 945 (2010)................................................................... 21, 40

*Silva v. Woodford,*
  279 F.3d 825 (9th Cir. 2002)........................................................... 27

*Slack v. McDaniel,*
  529 U.S. 473 (2000)................................................................... 11, 43

*Steward v. Cain,*
  259 F.3d 374 (5th Cir. 2001)........................................................... 39

*Strickland v. Washington,*
  466 U.S. 668 (1984)................................................................. *passim*

*Trevino v. Thaler,*
  569 U.S. 413 (2013)......................................................................... 57

*Wiggins v. Smith,*
  539 U.S. 510 (2003)...................................................... 14, 15, 37, 44

*Williams v. Stirling,*
  914 F.3d 302 (4th Cir. 2019)................................................ 26, 40, 42

*Williams v. Taylor,*
  529 U.S. 362 (2000)................................................................... 37, 40

*Wilson v. Sellers,*
  584 U.S. 122 (2018)......................................................................... 38

*Woodford v. Visciotti,*
  537 U.S. 19 (2002)........................................................................... 36

v

*Woodfox v. Cain,*
772 F.3d 358 (5th Cir. 2014) ............................................................... 39

*Ylst v. Nunnemaker,*
501 U.S. 797 (1991) .............................................................................. 38

**State Cases**

*Bigby v. State,*
892 S.W.2d 864 (Tex. Crim. App. 1994) ............................................. 45

*Dillbeck v. State,*
643 So.2d 1027 (Fla. 1994) ................................................................. 27

*Rubio v. State,*
241 S.W.3d 1 (Tex. Crim. App. 2007) ................................................... 6

*Rubio v. State,*
No. AP-76,383, 2012 WL 4833809 (Tex. Crim. App. Oct. 10, 2012) ..................................................................................................... 9

*Ex parte Rubio,*
2022 WL 221485 (Tex. Crim. App. Jan. 26, 2022) ....................... 11, 56

*Ex parte Rubio,*
No. WR-65,784-02, 2018 WL 2329302 (Tex. Crim. App. May 23, 2018) ........................................................................... 10, 36, 38, 39

**Federal Statutes**

28 U.S.C. § 2253(c) ................................................................................ 11

28 U.S.C. § 2254(d) ......................................................................... *passim*

28 U.S.C § 2254(e)(2) ............................................................................ 58

**State Statutes**

Tex. Code Crim. Proc. art. 11.071, § 5(a) .............................................. 56

Tex. Code Crim. Proc. art. 37.071 § 2(g) ............................................... 21

Tex. Penal Code § 8.01 .......................................................................... 45

vi

## Rules

Fed. R. Civ. Pro. 59(e) ............................................................... 11

## Constitutional Provisions

Sixth Amendment ............................................................ 12, 43

## Other Authorities

*ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913 (2003) ................................................................................... *passim*

*Supplementary Guidelines for the Mitigation Function of the Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev. 677, 689 (2008) ............................................................................ 14

## MOTION FOR CERTIFICATE OF APPEALABILITY

Petitioner–Appellant John Allen Rubio requests a certificate of appealability ("COA") pursuant to 28 U.S.C. § 2253(c) because he can make a substantial showing that his constitutional rights were violated and because the district court's resolution of procedural impediments to merits consideration is debatable. Rubio requests a COA to appeal the district court's order denying: (1) his Sixth Amendment claim that defense counsel prejudicially failed to investigate the consequences of prenatal alcohol exposure; (2) his Sixth Amendment claim that defense counsel's preparation of the insanity defense was prejudicially deficient; and (3) his due process claim, under *Napue v. Illinois*, 360 U.S. 264 (1959), that the prosecution elicited testimony that it knew, or should have known, to be false and misleading.

## BRIEF IN SUPPORT OF MOTION FOR CERTIFICATE OF APPEALABILITY

Rubio and his wife killed their three young children. Rubio, however, has severe mental illness—mental illness about which his defense team failed to develop evidence and about which the State elicited false testimony. The three constitutional violations at issue here compounded each other because each violation allowed the State to tell the jury that mental illness did not reduce Rubio's culpability. Reasonable jurists could debate the district court's denial of these claims, and a COA should issue.

## STATEMENT OF THE CASE

### I.    The crime.

On March 11, 2003, believing them to be possessed by his deceased grandmother, Rubio cut off the heads of his three young children: Julissa, (three); John Estefan (one); and Mary Jane (two months). At the time of the offense, Rubio was living with his common law wife, Angela Camacho. The family had previously lived on the street, and in a vacated home with no electricity and no running water. ROA.33583. Child Protective Services took the children away for a period, but Rubio and Camacho got an apartment and were able to get them back. ROA.33585-89. Rubio took

parenting classes, got a job, and—for a period—stopped using drugs. ROA.33586. To make money, Rubio washed cars and worked as a prostitute. ROA.33448. Rubio's mother, who was also a drug-addicted prostitute, paid little rent but lived with the family in the apartment. ROA.33588-89.

In the days before the murder, Rubio became increasingly gripped by a delusion, seemingly present in some form or another since childhood, that he was the protagonist in a good-versus-evil struggle for the world. Emotional disturbance had landed him in special education classes starting in the third grade, and he frequently sought help from mental health professionals, reporting that he was the "chosen one." ROA.34124-27, 34203-04. His mother, who facilitated Rubio's transition to prostitution at around eight years old, ROA.34278, explained that Rubio heard voices, saw shadows, and reported that God was telling him to save the world. ROA.34130, 34145-46.

In the days before the murders, Rubio and Camacho had largely secluded the family to prepare for the ultimate good-versus-evil confrontation, periodically dousing the apartment with bleach to the point that it became difficult to breathe. ROA.34274-75. The day before

3

the offense, Rubio and Camacho had gone to the hospital to retrieve records necessary to get food stamps, ROA.33478, and Rubio's behavior became especially erratic on the way home. Rubio told Camacho that the people on the bus with them were physical threats, that a woman waiting at a stop wanted to steal their money, and that a little girl was trying to poison John Estefan. ROA.33482-84. When they got off the bus, Rubio told Camacho that a woman with "marks" on her forehead had made a devil's sign and that they needed to rush home. Camacho agreed and they ran back to the apartment. ROA.33484-85, 33507-08.

When they returned home, Rubio "tested" Julissa by sweeping an egg over her and cracking it into a glass of water. ROA.33538-39. Rubio concluded that someone had done something evil to her, and neither Rubio nor Camacho could sleep that night. ROA.33476, 33539. When Rubio's mother—who he believed to be a witch—came home at about 2:00 a.m., she refused Rubio's request that she help him ward off evil spirits. ROA.33539-41. Rubio's paranoia continued to spiral throughout the night and early morning. At some point, he became concerned that evil spirits would try to enter the apartment, so he nailed the back door shut. ROA.33525, 33561-62. He also threw a blanket over the bedroom mirror.

4

ROA.33525-26. Believing his mother to have cast a spell on the family's three pet hamsters, Rubio killed the animals with a hammer and bleach. ROA.33527, 33562-63.

Rubio told Camacho he was on the right side of a struggle between good and evil men—with seven on each side. ROA.33450, 33476. At some point, Rubio decided that, as part of this struggle, he needed to kill the children because they were spiritually possessed by his deceased grandmother, whom he also believed to be a witch. Rubio, with assistance from Camacho, decapitated Mary Jane, then Julissa, and then John Estefan. ROA.33454-55, 33464-65. They put the children's heads in plastic bags. ROA.33457, 33468. After the murders, they had sex, tried to clean the apartment, and then walked to the corner store. ROA.33459-63, 33469-70.

The murders were discovered hours later when Rubio's brother and Camacho's friend came over for a visit, and then left to locate police. ROA.34676-83. A police officer went with them back to the apartment, and Rubio simply said, "[T]he kids are in the backroom." ROA.32627-28, 34683. When the officer saw one of the headless bodies, Rubio put his hands together and said, "[A]rrest me." ROA.32589-90. On his way to the

5

police station, Rubio told an officer: "I cut my daughter's head off. She was looking at me like she was possessed . . . . I remember seeing a bunch of cats through my window." ROA.32650-51.

## II. Trials and direct review.

Rubio and Camacho were both indicted for capital murder. Rubio was first convicted and sentenced to death in 2003, but the Texas Court of Criminal Appeals ("TCCA") ordered a retrial because Camacho's out-of-court statements were unconstitutionally introduced against Rubio. *Rubio v. State*, 241 S.W.3d 1 (Tex. Crim. App. 2007).

In July 2010, Rubio was again tried for capital murder. Rubio alleged that he was not competent to stand trial, ROA.6260-62, and he also pleaded not guilty by reason of insanity ("NGRI"), ROA.20650. The jury found Rubio competent to stand trial. ROA.16002.

A major focus of the trial's guilt phase was whether Rubio was insane at the time of the offense. The defense presented Dr. William Valverde, a board-certified psychiatrist. ROA.22365. While examining Rubio to evaluate whether he was competent for his 2003 trial, Dr. Valverde concluded that Rubio was insane at the time of the offense. ROA.22355. The defense tasked Dr. Valverde only with an insanity

6

evaluation. Dr. Valverde found that Rubio "had symptoms consistent with paranoid schizophrenia." ROA.22383. Dr. Valverde testified he believed that, at the time Rubio committed the murders, Rubio was legally insane. ROA.22395-97. Defense attorney Ed Stapleton was doing his first death penalty trial, and he prepared Dr. Valverde with the wrong insanity standard—one that centered on whether Rubio failed to appreciate the moral wrongness of his act rather than its illegality, with Texas law requiring the latter. ROA.22392, 22398.

The other defense expert presented at the guilt phase of the trial was Dr. Raphael Morris, a forensic psychiatrist. ROA.22454. Dr. Morris was given a narrow referral question: "to determine if at the time of the conduct charged, Mr. Rubio, as a result of a severe mental disease or defect, did not know that his conduct was wrong." ROA.193. Dr. Morris testified that Rubio had paranoid schizophrenia and substance abuse dependence. ROA.22481-82. As to the insanity defense, Dr. Morris testified that Rubio had a "severe mental disease or defect" and that "at the exact moment that he [committed the offense] he did not know it was wrong." ROA.22491-92. On cross-examination, the State exposed that Dr.

7

Morris, too, applied the wrong insanity standard in his report. ROA.22524.[1]

One of the State's insanity witnesses, and its only mental health expert, was forensic psychiatrist Dr. Michael Welner. ROA.23129. His testimony loomed over both guilt and punishment phases, and he dramatically emphasized the absence of evidence showing brain damage: "his neuropsychological testing demonstrated that he had *no evidence of brain damage and that he had no evidence of brain disease.*" ROA.23241 (emphasis added). He also testified that Rubio did not have schizophrenia. ROA.23255. Dr. Welner explained that "any history . . . of him experiencing peculiar phenomena [has been] pinpointed . . . to times that he was intoxicated." ROA.23256. Crucially, Dr. Welner told the jury that, *even though Rubio was not taking anti-psychotic medication*, Rubio had not experienced the decline typically associated with the first (prodromal) stage of schizophrenia. ROA.23257-59. ("But we are talking seven years, and the great majority of the time he has not been on anti-

---

[1] The State emphasized this point in its closing argument: "Doctor Morris, he didn't even use the proper standard, ladies and gentlemen, when he evaluated the defendant . . . . He didn't even use the correct standard in the State of Texas for insanity." ROA.23382.

psychotic medications. . . . [A]n unmedicated chronic schizophrenic would not be able to maintain that intact presentation for a sustained period of time.").

On July 26, 2010, the guilt-phase jury convicted Rubio on four counts of capital murder. ROA.35338. The punishment-phase jury answered the special issues in a way that required the court to impose a death sentence. ROA.36091-92, 36096. The TCCA later affirmed the conviction and sentence. *Rubio v. State*, No. AP-76,383, 2012 WL 4833809 (Tex. Crim. App. Oct. 10, 2012).

## III.   State post-conviction proceedings.

Rubio's initial state post-conviction application was filed on October 11, 2013. Among other claims, that application asserted that trial counsel was constitutionally ineffective for failing to investigate fetal alcohol spectrum disorder ("FASD"). ROA.43502-30.

At a hearing on that application, Ed Stapleton and Nat Perez both stated that they provided ineffective assistance of trial counsel. ROA.41512. Stapleton testified that he was ineffective under oath, and Perez yelled, from the jury box: "We provided ineffective assistance of counsel." ROA.41512. Stapleton had been in charge of the mental health

9

evidence, and he explained that Rubio's was actually his first death penalty trial. ROA.41513. Stapleton also explained that he had failed to adequately handle mental health components of Rubio's case. ROA.41494-95, 41503.

In an exchange with Stapleton, who was on the witness stand, the state post-conviction judge, who was also the trial judge, agreed with the proposition that the case was close. Specifically, the trial judge agreed that, had life-without-parole been the sentencing alternative, Rubio would not have received the death penalty. ROA.41516.

The state post-conviction judge nonetheless adopted findings recommending that all relief be denied. ROA.44835-48. The TCCA thereafter denied all relief. *Ex parte Rubio*, No. WR-65,784-02, 2018 WL 2329302, at *1 (Tex. Crim. App. May 23, 2018). It denied the FASD claim on the merits. *Id.* at *3.

## IV. Federal habeas and exhaustion proceedings.

Rubio timely filed a federal habeas petition on September 4, 2019, raising ten claims. ROA.54-165. With approval from the district court, he filed an Amended Petition on February 18, 2020. ROA.279-454. After exercising leave to exhaust claims in state court, ROA.1755-58, Rubio

10

then filed a subsequent state application with the TCCA on July 23, 2021. ROA.1759. The TCCA dismissed the claims in that subsequent application "without considering the claims' merits." *Ex parte Rubio*, 2022 WL 221485, \*3 (Tex. Crim. App. Jan. 26, 2022). Rubio then filed a Second Amended Petition, ROA.1813-992. He also sought discovery, ROA.2376, which the district court denied, ROA.2497.

On April 5, 2024, the district court entered an order denying Rubio's federal habeas petition and refusing a COA. ROA.2498-594. Rubio timely filed a Motion to Alter or Amend Judgment under Rule 59(e), ROA.2596, which the district court also denied, ROA.2630.

## STANDARD OF REVIEW

A habeas petitioner must have any appeal certified, and a COA requires the movant to demonstrate "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). For a claim decided on the merits, a COA should issue where "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For claims denied on procedural grounds, a COA should issue if "jurists of reason would find

11

it debatable whether the district court was correct in its procedural ruling." *Id.*

The Supreme Court has made clear that the COA analysis is a "threshold inquiry [that] does not require full consideration of the factual or legal bases adduced in support of the claims" and, "[i]n fact, the statute forbids it." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). The COA "standard is less burdensome in capital cases, as in a death penalty case any doubts as to whether a COA should issue must be resolved in the petitioner's favor." *Nelson v. Davis*, 952 F.3d 651, 658 (5th Cir. 2020) (internal quotations omitted).

## ARGUMENT

**I. This Court should certify for appeal Rubio's claim that his Sixth Amendment right to counsel was violated because the defense failed to reasonably investigate Rubio's prenatal exposure to alcohol.**

Rubio has a Fetal Alcohol Spectrum Disorder ("FASD"). The district court's resolution of the claim that trial counsel deficiently failed to investigate red flags for his FASD ("IATC-FASD claim") was debatable for the same reason that the state courts decided it unreasonably. In both instances, judges confused conditions under the FASD umbrella with one another. Specifically, they credited the false layperson intuition that

12

FASD always presents with facial dysmorphia. Trial counsel's mistake was reasonable, the courts say, because the absence of observable facial dysmorphia excuses it. Many people, however, have FASDs with no facial irregularities, and competent counsel would not have assumed otherwise. The underlying IATC-FASD claim is debatable, as was the district court's application of the relitigation bar in 28 U.S.C. § 2254(d).

## A.  Reasonable jurists could debate the claim's underlying merit.

To prove an IATC claim, Rubio must show that trial counsel's performance was deficient and that the deficiency prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). In this case, trial counsel was deficient for failing to reasonably investigate FASD— specifically, by terminating the investigation because they thought that all FASDs required visually observable facial dysmorphia. And because they had no medical account of Rubio's impairments, they were left vulnerable to the State's accusations that he was faking them for litigation benefit.

### 1.  Trial counsel was deficient.

Professional norms prevailing at the time of Rubio's 2010 trial capture defense counsel's duty to investigate and prepare defenses for

both guilt and sentencing phases. *See Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, American Bar Association, 31 Hofstra L. Rev. 913 (2003) (ABA Capital Case Guidelines), Guideline 1.1 at cmt., 10.7(A), 10.11(A). That abstract duty includes a more concrete obligation to reasonably investigate mitigation. *See* ABA Capital Case Guidelines, Guideline 10.7; *Supplementary Guidelines for the Mitigation Function of the Defense Teams in Death Penalty Cases*, 36 Hofstra L. Rev. 677, 689 (2008) ("Mitigation Guidelines"), Mitigation Guideline 10.11. Those professional norms are reflected in Supreme Court cases holding that failures to reasonably investigate mitigation, including failures to explore red flags in an otherwise adequate mitigation investigation, constitute deficient performance. *See Wiggins v. Smith*, 539 U.S. 510, 527 (2003) (pegging deficiency to factual awareness that "would lead a reasonable attorney to investigate further."); *id.* at 523 (deficiency inquiry is "whether the investigation supporting counsel's decisions . . . itself was reasonable").

The Guidelines that applied at Rubio's trial repeatedly mention the defense team's duty to explore FASD. *See* Capital Case Guidelines, Guideline 4.1 at cmt (describing FASD investigation as "critical[ly]

14

importan[t]"); *id.* at Guideline 10.7 at cmt, n. 211 (explaining that mitigation investigation must trace to birth because of, among other things, FASD); *id.* at Guideline 10.11 at cmt (underscoring the importance of experts because they can testify to, among other things, FASD). Here, trial counsel failed to reasonably explore the effects of Rubio's prenatal alcohol exposure, even though they knew that Rubio's mother drank heavily throughout her pregnancy. That consumption—as seen in counsel's file and mentioned during competency proceedings, ROA.1887-88 (collecting citations to file and hearing transcripts)—was a red flag that counsel failed to investigate reasonably.

Understanding the ineffectiveness here requires some basic understanding of FASD, which is an umbrella category that encompasses three more specific conditions: Fetal Alcohol Syndrome ("FAS"), Partial Fetal Alcohol Syndrome ("pFAS"), and Alcohol Related Neurodevelopmental Disorder ("ARND"). FASDs are therefore a family of diagnoses marked by "the presence of significant damage caused by prenatal consumption of alcohol." ROA.494 (Report of Paul D. Connor, Ph.D., psychological evaluation). Determining whether an individual suffers from a condition under the FASD umbrella involves physical

examination by a medical doctor. *See* ROA.493-505 (Connor Report);
ROA.515-17 (Report of Kenneth Lyons Jones, M.D., neurological
evaluation); ROA.565-643 (Declaration of Natalie Novick Brown, Ph.D.).
The DSM-5[2] uses the term Neurodevelopmental Disorder Associated
with Prenatal Alcohol Exposure ("ND-PAE") to refer to FASDs, and
Rubio uses the two terms interchangeably. ROA.495, 607.[3]

The most important feature of FASD, for these purposes: *the FASD
diagnosis does not entail the facial dysmorphia that some laypeople
mistakenly believe to be the disorder's primary marker. See* ROA.495
("ND-PAE . . . does not rely on the facial features associated with FAS
and PFAS in making the diagnosis.); ROA.609 ("FASD tends to be a
hidden condition because most people in this population have . . . no
obvious physical abnormalities."). No matter the diagnosis within the
umbrella—whether there is facial dysmorphia or not—the mitigating

---

[2] The previous version of the DSM, the DSM-IV-TR, was routinely used by
professionals prior to 2013 to diagnose the mental defect in FASD as "Cognitive
Disorder Not Otherwise Specified." ROA.634. Rubio met the criteria under DSM-IV-
TR based on the information available at the time of his trial. ROA.634.

[3] The ND-PAE guidelines are consistent with FASD guidelines published by the CDC
(in 2004) and Institute of Medicine (in 1996). "[T]hose who meet criteria for a medical
FASD diagnosis under IOM guidelines likely meet mental health criteria for ND-PAE
in DSM-5 as the two essential features common in both sets of guidelines are prenatal
alcohol exposure and central nervous system (CNS) abnormality." ROA.607 n.33.

impairments are constant across all three FASDs. ROA.608. FAS is marked by "a specific criteria of facial features . . . growth deficiency . . . [and] evidence of [CNS] abnormalities." ROA.494. PFAS is marked by some but not all growth deficiencies and facial features of FAS, and ARND is marked by CNS abnormalities but often presents without physical features. *See* ROA.495. Whatever the facial features of the FASD, all three of them—including the two not associated with extreme facial irregularities—have the same effects on central nervous system physiology and impairment. "[R]egardless of diagnosis under the FASD umbrella, the brain damage is the same. That is, the brain damage in ARND tends to be just as severe as that in FAS." ROA.608.

Rubio's two defense counsel failed in their duty to thoroughly investigate the red flags for FASD, which came from three primary sources: (1) Rubio's 2003 trial, (2) the investigation leading up to the 2010 trial, and (3) the competency hearing before the 2010 trial. First, counsel from the 2010 trial had access to the record from Rubio's 2003 trial; in fact, Nat Perez was counsel on both cases. Perez therefore heard Dr. Valverde's testimony that Rubio's "mother apparently had a heavy drug use problem." ROA.1887-88 (citing 28 RR 87 from 2003 trial transcript).

Moreover, defense counsel Stapleton affirmed that he was "obviously" aware of Rubio's prenatal exposure to alcohol, and he testified, in reference to FASD, that he read "the whole transcript from the prior trial." ROA.3539.

Second, there were red flags for FASD in the investigation that preceded the 2010 trial. Rubio's mother told a defense expert that she "drank about a six-pack per day throughout her pregnancy." ROA.43619 (Report by John Matthew Fabian, Psy.D, J.D.). The expert's report noted that "maternal alcohol and nicotine use during pregnancy" is a "family risk factor relevant to this case." ROA.43639 (Fabian Report). Two other experts working with the defense team included in their reports or notes for their trial testimony that Rubio's mother was drinking while pregnant, and they flagged this potential risk factor in Rubio's background. ROA.43646 (Report by John Pinkerman, Ph.D. and Vittorio T. Puente, Ph.D.). Another expert (Dr. Jolie Brams) included in her notes that she intended to testify that one factor impacting Rubio was "in utero insult . . . smoking and drinking, drugs." ROA.43661 (Report of Dr. Jolie Brams, Ph.D.). On April 1, 2009, Rubio told a defense-team interviewer

that his "[m]other may have been drinking and doing drugs-marijuana during pregnancy." ROA.177.[4]

Third, red flags also came out during the 2010 competency proceedings, which preceded the trial's guilt and sentencing phases. Dr. Raphael Morris testified that Rubio's mother "couldn't stay sober" and had a significant history of substance abuse that possibly contributed to Rubio's own poly-substance abuse problems. ROA.14726. Crucially, FASDs were not within the scope of the referral to Dr. Morris—in other words, he was not asked to exclude them, and he was not given information necessary to diagnose. Somewhat exasperated, he testified: "I haven't been able to see the full extent of it." ROA.14726. Notwithstanding the constraints of the referral, he still testified that Rubio's psychotic symptoms could be related to his pre-natal alcohol exposure, and he discussed the risks of consuming alcohol while pregnant. ROA.14726. Rubio's mother herself offered sworn testimony that she exposed Rubio to "about a six pack" daily throughout Rubio's prenatal development. ROA.15013-15; *see also* ROA.43616-19 (Fabian

---

[4] This note from trial counsel's file does not appear in the state court record and, cannot be used to determine whether Rubio avoids § 2254(d). This Court, however, must consider the note if § 2254(d) does not restrict relief.

Report) (detailing information about how Rubio's mother drank while pregnant and issues with Rubio's development). Rubio's uncle testified that Rubio's mother "was doing drugs," using "spray," and "stoned" during her pregnancy. ROA.14897-98.

Even after the FASD risks were disclosed in the competency proceedings, counsel failed to investigate further. They did not seek experts with FASD expertise, did not ask existing experts to evaluate Rubio for FASDs, and did not otherwise develop the connection between Rubio's impairments and his mother's pregnancy. Trial counsel admitted *under oath* that the FASD inquiry was abandoned as a direct result of Stapleton's false layperson sense that all FASDs required extreme dysmorphia:

> I'll tell you where I think -- what I think happened as far as Fetal Alcohol Syndrome -- is that we were familiar with it. We had heard of -- heard of it. *And I probably made the false assumption that, you know, we should see some sort of facial changes.* Part of that was because one of the lawyers we knew in town had had a daughter with Fetal Alcohol Syndrome, and I had seen her, and I knew what it looked like. And so I thought that -- well, you know, that's one of the characteristics. And then when I got Dr. Owens' report on Fetal Alcohol Syndrome or lack of Fetal Alcohol Syndrome, then I didn't -- I didn't focus on it. *So, you know, I -- It -- And until I saw your reports on Saturday, I did not realize how important it was.*

ROA.3539-40 (emphasis added); *cf. also* ROA.3599 (co-counsel Nat Perez

stating that "[w]e provided ineffective assistance of counsel"). *But see*

ABA Guidelines, ABA Guideline 4.1 (noting that "Counsel's own

observations . . . can hardly be expected to be sufficient to detect the array

of conditions (e.g., . . . fetal alcohol syndrome . . . ) that could be of critical

importance.") (emphasis added).

## 2. The deficiency was prejudicial.

There is prejudice when deficiencies have reasonably probable

effects on guilt or sentencing phase outcomes. *See Strickland*, 466 U.S.

at 698. The sentencing-phase prejudice inquiry looks to "the totality of

available mitigation evidence—both that adduced at trial, and the

evidence adduced in the habeas proceeding[s]," and evaluates how the

difference would have affected the sentencing outcome. *Porter v.

McCollum*, 558 U.S. 30, 41 (2009) (quoting *Williams v. Taylor*, 529 U.S.

362, 397–98 (2000)). Prejudice cannot be foreclosed simply because

counsel made an "effort to present some mitigation evidence." *Sears v.

Upton*, 561 U.S. 945, 955 (2010). Under Texas law, Rubio needed to

convince only a single juror to spare his life. *See* Tex. Code Crim. Proc.

art. 37.071 § 2(g).

21

To summarize what follows, the sentencing-phase case was close—the trial judge agreed that Rubio would not have gotten a death sentence had the jury been able to impose life without parole as an alternative. ROA.3563. Had the appropriate experts been retained with the referral questions and diagnostic information that reasonably competent counsel would have provided, those experts would have discovered that Rubio has an FASD. That information could have been used at voir dire, and during all trial phases. The FASD analysis later conducted by the post-conviction experts "could have been conducted by any number of qualified FASD professionals at the time of Mr. Rubio's penalty hearing in 2010." ROA.643. Crucially, the defense would have been able to answer the State's devastating suggestion that Rubio was faking his impairments, *see* ROA.35134-36, which are FASD-consistent, *see* ROA.633.

Reasonable investigation would have allowed trial counsel to prove Rubio had an FASD. *See* ROA.44029 (Affidavit of Dr. Richard Adler, M.D.); ROA.493 (Connor Report). When the current batteries are combined with the earlier testing, Rubio demonstrates deficits in seven domains of neuropsychological functioning. ROA.504. Witness reporting and records corroborate the substantially impaired executive

functioning, and they show life-long impairment. His social security and school records, for example, reveal a history of childhood emotional disorders. ROA.35926. His school records demonstrate impairments in cognitive and executive functioning, starting in first grade (when he was held back) and running through twelfth (when he was terminated from ROTC). ROA.623-24. Indeed, Rubio was enrolled in special education and designated with a learning disability starting second grade. ROA.623-24. He had "foggy brain" and "profound" learning disabilities, plus dyslexia. See ROA.191 ("foggy brain");[5] ROA.43619 (Fabian Report); ROA.35924-25.

Rubio also has adaptive deficits consistent with FASD. "[He] display[s] the 'signature' behavior profile unique to individuals with FASD, both in childhood and during his adult years." ROA.598. Three respondents were given the Fetal Alcohol Behavior Scale ("FABS") to assess whether Rubio had FASD-consistent deficits. All three results indicated that Rubio has an FASD. ROA.598. Additional testing—frequently involving the FABS respondents—also demonstrated

---

[5] As with footnote 4, supra, these mitigation notes cannot be used to determine whether Rubio satisfies § 2254(d)(1) or (d)(2), but may be used to evaluate the claim on the merits if § 2254(d) does not restrict relief.

substantially deficient adaptive functioning. ROA.597-98. Rubio's adaptive functioning at age 21 was worse than it was at age 12. ROA.598. This is FASD-typical progression because, "as real-world behavioral expectations become more complex with advancing age, the adaptive functioning of those with permanent brain damage falls further and further behind that of normally-constituted age-peers." ROA.597.

Finally, Rubio's neuropsychological profile, which shows extreme impairment, is consistent with indicators of an FASD detected by qualified experts. Enhanced digital photographs of his face reveal that he does have dysmorphic facial features. A December 10, 2019 evaluation showed that Rubio had two of the three required facial features for a diagnosis of FAS, the FASD condition that is most associated with facial irregularities.[6] ROA.516. Rubio has a smooth philtrum and a smooth vermilion border of his upper lip. ROA.516. He also has "midface hypoplasia, inability to extend his thumbs and fingers bilaterally, and inability to rotate his elbows bilaterally." ROA.516. These features are

---

[6] As with footnote 4, *supra*, these images cannot be used to determine whether Rubio satisfies § 2254(d)(1) or (d)(2), but may be used to evaluate the claim on the merits if § 2254(d) does not restrict relief.

24

"seen more frequently in individuals prenatally exposed to alcohol."
ROA.516.

An FASD diagnosis would have played a critical role at trial because it would have explained and cohered otherwise disjointed evidence—of impaired functioning, brain damage, and mental health problems—that was in the record. Had the jurors heard the FASD evidence, and had the jury been selected with that evidence in mind, *see* ROA.3414-20, there is a reasonable probability that the investigation's results would have had affected one of the trial outcomes. Whereas the empaneled jury heard about symptoms that were largely attributed to Rubio's life choices and was told that Rubio was faking unusual behavior, a competent investigation would have instead linked those attributes, and the associated impairments, to Rubio's prenatal alcohol exposure. The State's expert, Dr. Welner, would not have been able to write off the totality of Rubio's impairment as self-inflicted or feigned. *See*, *e.g.*, ROA.35128 ("That is self-serving because it approximates a mental health defense."); ROA.35135 (opinion that Rubio tried to "look more ill"). In fact, Dr. Welner dramatically emphasized the absence of evidence showing brain damage: "his neuropsychological testing demonstrated

25

that he had *no evidence of brain damage* and that he had no evidence of

brain disease." ROA.35138 (emphasis added).[7]

Had trial counsel reasonably investigated FASD, the whole

evidentiary picture would have changed. Even Dr. Welner acknowledged

that diagnostic testing is heavily influenced by the information available

to the expert. *See* ROA.35133 ("You don't just sit down and take a

psychological test and get all of the answers. It is done in the context of

other available information."). The substantial effect of FASDs on juries

is well established. One of the leading Supreme Court cases on deficient

sentencing investigation found prejudice largely because the claimant's

"problems relate back to his childhood, and were likely caused by fetal

alcohol syndrome." *Rompilla v. Beard*, 545 U.S. 374, 392 (2005); *see also,*

*e.g.*, *Williams v. Stirling*, 914 F.3d 302, 318 (4th Cir. 2019) (leading FASD

case finding prejudice because "FAS evidence was different from the

other evidence of mental illness and behavioral issues because it could

---

[7] Dr. Welner was not suggesting that the record disproved brain damage, but that there was not corroborative evidence in the record. *See*, *e.g.*, ROA.35312.

have established . . . a neurological defect that caused Williams' criminal behavior.").[8]

An FASD diagnosis would have had dramatic effects on the mitigation profile, but it would have had a reasonably probable effect on the dangerousness inquiry, too. FASD impacts the dangerousness inquiry because, once it is diagnosed, it "can be treated effectively to reduce risk of agitation, mood swings, and other mental health symptoms that elevate risk of violence." ROA.643.

## B. Reasonable jurists could debate whether § 2254(d) restricts relief.

Although some courts refer informally to 28 U.S.C. § 2254(d) as a standard of review, that is not the way it functions. Section 2254(d) applies when state courts deny claims *on the merits*. In that scenario, claimants do not get federal habeas relief if they avoid § 2254(d); they just get a chance to argue the merits. Rubio avoids § 2254(d) for two reasons, and the debatability of either is sufficient to certify an appeal.

---

[8] *See also, e.g.*, *Silva v. Woodford*, 279 F.3d 825, 847, 856 n.17 (9th Cir. 2002); *Castro v. Oklahoma*, 71 F.3d 1502, 1514, 1515 (10th Cir. 1995); *Dillbeck v. State*, 643 So.2d 1027, 1029 (Fla. 1994).

### 1. Reasonable jurists could debate whether Rubio satisfies § 2254(d)(2), an argument the district court wholly failed to address.

Section 2254(d)(2) disables the relitigation bar if the state decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Rubio extensively argued under § 2254(d)(2) below. ROA.1911-15. The district court simply failed to reach the issue, and the appeal should be certified for that reason alone. What follows is only a general sketch of the § 2254(d)(2) arguments, in view of the district court's omission.

The factual unreasonableness of the state-court decision again reflects a basic misunderstanding of the relationship between FASD, a family of disorders, and FAS, one member of that family. That mistake infected the state courts' findings as to both defense experts, to whom district court cited as adequate reasons for the discontinued FASD investigation. *See* ROA.2532. The State Findings, adopted in pertinent part by the TCCA, emphasize the experts' failure to diagnose FASD, even though such diagnosis was outside the scope of the referral questions. ROA.44839-40. Doctors Jim Owens and Raphael Morris each received very narrow referral questions that excluded FASD evaluation and they

lacked crucial diagnostic information that would have indicated FASD. The findings of those experts, discussed separately below, does not cure the upstream failure to investigate FASD.

Start with Dr. Owens, retained in 2009 to consider whether Rubio had epilepsy. In evaluating Rubio, Dr. Owens visually observed no evidence of facial dysmorphia. ROA.44839. The State Findings, however, flatly confuse FAS with FASD, making the familiar mistake involving dysmorphic faces: "[Dr. Owens] informed [defense counsel] that he has found no facial dysmorphia, a classic feature of those who suffer from FAS *or FASD*." ROA.44840 (emphasis added). This finding is just wrong, and it triggers § 2254(d)(2). The just wrong part: as explained repeatedly, two conditions within the FASD family do not require facial dysmorphia.

The Texas courts also overstated Dr. Owens' findings in other respects. First, Dr. Owens in fact took no position on any FASD, in part because defense counsel never informed him that Rubio's mother drank while she was pregnant. *See* ROA.39131-36 (diagnostic information omitting any reference to utero insult); ROA.39136 (underscoring that his diagnosis was constrained by information recited in report). Nor did Dr. Owens' neurological testing rule out brain damage from prenatal

alcohol exposure. Per Dr. Owens' own report: "There is some atrophy which appears out of proportion to the patient's age over the parietal convexity. . . . This finding is very non-specific and does not indicate any particular pathological process. Static regional atrophy may be seen in patients with a prolonged history of substance abuse or *other toxic exposures* . . . ." ROA.39134 (emphasis added). Another problem is that Dr. Morris spoke with Dr. Owens before Dr. Morris testified, and Dr. Morris testified that Dr. Owens *had not* ruled out organic brain disorder. ROA.14841. Finally, the cursory visual observation that led Dr. Owens to conclude that Rubio had no facial abnormalities was ultimately proven incorrect by a digital assessment of Rubio's face. ROA.44030 (Adler Aff.).

Now consider Dr. Morris, who was told only to evaluate whether Rubio had psychosis sufficient to establish an insanity defense. ROA.42116. Contrary to the TCCA's findings, Dr. Morris *never* said he excluded FAS and he certainly was not retained "with an eye towards exploring FASD," as the district court asserted without citation. ROA.2525. Dr. Morris merely noted that he had not *diagnosed* FASD, ROA.14834 ("I have not diagnosed Fetal Alcohol Syndrome"), and his inventory of diagnostic inputs make clear that trial counsel did not

provide him with information necessary to make any FASD diagnosis. *See* ROA.42121-22. The district court correctly observed that Dr. Morris reviewed Dr. Owens' report, *see* ROA.2525, but quite overstated its effect on Dr. Morris's conclusions. Dr. Morris actually objected when the State tried to imply that Dr. Owens had excluded organic brain damage, and Dr. Morris testified instead that Dr. Owens' MRI was insufficient for broad conclusions about organicity. *See* ROA.14841 ("The MRI did not give any evidence that would support a psychiatric diagnosis. It showed some atrophy, but not specific. [Dr. Owens] wasn't able to come up with any significant conclusions, although that's not uncommon."); ROA.14841 ("[Dr. Owens] didn't think it supported a mental health diagnosis, the MRI.").

The TCCA reinterpreted Dr. Morris's statement that he had not *diagnosed* FAS as a statement that he had *ruled out* "FAS or FASD." ROA.44840. Dr. Morris quite expressly *refused* to exclude FASD, testifying that he lacked sufficient information about Rubio's in utero alcohol insult:

> MORRIS: … And so I interviewed his mother, who I noted to have some mental health history, *although I haven't been able to see the full extent of it.* I know that she had a significant substance abuse history and couldn't stay sober.

31

Q: Why is that significant … ?

MORRIS: … [I]t contributed to his own problems with substances. It also goes to the possibility that there may have been some contribution of substances while she was pregnant with him, which can also -- there is a lot of theories of how people develop psychotic symptoms that would be relevant.
…

Q: What are -- what are the risks of alcohol or other drug abuse in utero?

MORRIS. *Fetal alcohol syndrome* and low birth weight.

ROA.14726 (emphasis added). Moreover, even if Dr. Morris's testimony could be (mis)construed as ruling out FAS, it cannot be construed as ruling out all *FASDs*.

There were other unreasonable factual elements of the State Findings, too. The record, for example, does not reasonably support the State Findings that counsel were aware of the red flags and "conducted an investigation to determine whether there was a causal link between [Rubio's mother's alcohol abuse and his observed impairments]," ROA.44838. Recall that defense counsel Stapleton testified under oath that the reason they abandoned an FASD investigation was because he thought FASDs required facial dysmorphia and Rubio had none. *See* ROA.3539-40.

### 2. Reasonable jurists could debate whether Rubio satisfies § 2254(d)(1).

The relitigation bar is disabled under § 2254(d)(1) when the state merits decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." Section 2254(d)(1) disables the relitigation bar, with respect to both deficiency and prejudice.

*Deficiency*. The thrust of the district court opinion was that the TCCA's deficiency finding was reasonable because Dr. Owens wrote a report omitting an FASD finding, because Dr. Morris reviewed that report, and because the state's expert (Dr. Welner) agreed that there was no brain damage. ROA.2531-32. The factual unreasonableness of the TCCA's finding is discussed in Section I.B.1, but the state courts committed unreasonable legal errors. Those errors mean that the district court's § 2254(d)(1) holding is debatable.

Start with the lowest hanging fruit. The idea that trial counsel reasonably discontinued investigation into fetal alcohol exposure because *the State's expert* found no organicity is outlandish. First, the investigatory obligations of defense counsel do not turn on broad factual assertions by the State's experts. Second, Dr. Welner's testimony

33

obviously came *after* the pertinent investigatory decisions were made—at the very end of the trial's guilt phase.

The rest of the district court's reasoning—that trial counsel reasonably discontinued investigation because Dr. Morris reviewed Dr. Owens' report—is not much stronger. The Fifth Circuit authority recited was generally to support the proposition that defense counsel need not undertake frivolous investigation after a "qualified neuropsychologist" finds that there is no brain damage. ROA.2532. The cited cases, however, do not bear on the situation here. It is true that trial counsel may discontinue investigation when they reasonably believe further investigation to be fruitless, *see Rompilla*, 545 U.S. at 383 (cited by district court at ROA.2532), but that does not excuse the deficiency of upstream investigation that causes them to form an erroneous belief in such futility. If defense attorneys deprive experts of information about alcohol exposure and the experts do not return an FASD diagnosis, the tainted diagnosis does not cure the deficiency in counsel's upstream work.

The district court relied primarily on *Gonzales v. Stephens*, 606 F. App'x 767, 772 (5th Cir. 2015), an unpublished opinion holding that defense counsel was not deficient for failing to retain an FASD expert.

The district court cited *Gonzales* for the proposition that trial counsel can rely on a neuropsychologist's opinion that a client does not have organic brain damage. *See* ROA.2532. But a moment's glance at that opinion reveals that it does not involve the situation here—where the neuropsychologist's opinion was downstream of the investigatory deficiency. In *Gonzales*, prenatal alcohol exposure was "known to" the examining neuropsychologist. 606 F. App'x at 772. Here, Dr. Owens did not know the extent of exposure, and Dr. Morris *was not a neurologist*. ROA.14840. In *Gonzales*, the decision not to investigate FASD came after a doctor, provided with all information about prenatal alcohol exposure, failed to find evidence of organic brain damage. 606 F. App'x at 772–73. Here, the whole problem is that the neurological assessments were not similarly informed; they were themselves tainted by the upstream deficiency. *See, e.g.*, ROA.14726 (Dr. Morris explaining that he was not given information necessary to evaluate FASD).

*Prejudice.* The state determination that Rubio was not prejudiced triggers § 2254(d)(1). It does so, first, because the TCCA's prejudice standard was "contrary to" clearly established Supreme Court law. Instead of evaluating whether the deficiency had a "reasonable

35

probability" of affecting the trial outcome, *Strickland*, 466 U.S. at 703, the TCCA instead required Rubio to "demonstrate[] that the result of his trial would have been different but for counsel's decision not to further investigate[.]" *Ex parte Rubio*, 2018 WL 2329302, at \*7. *See also Woodford v. Visciotti*, 537 U.S. 19, 22 (2002) (holding that the "reasonable probability" standard was not a "preponderance" rule).

The district court's resolution of Rubio's prejudice-standard argument was debatable because it was wrong. The district court's primary § 2254(d)(1) reasoning was that the TCCA cited to the page in *Strickland* where *Strickland* discussed prejudice, ROA.2533, but the citation to that page in *Strickland* says nothing about whether the TCCA misinterpreted the *Strickland* standard discussed there. The district court's holding is especially puzzling because the page right before the one that the TCCA cited makes clear that a preponderance standard is *not* permissible. *See Strickland*, 466 U.S. at 693 ("[W]e believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case"). Moreover, a rule that a preponderance standard is "shorthand" for "reasonable probability" would create a split with the Fourth, Sixth, and Ninth Circuits. *See Long*

*v. Hooks*, 972 F.3d 442, 458–60 (4th Cir. 2020) (holding that preponderance standard was "contrary to" a "reasonable probability" requirement); *Carusone v. Warden, N. Cent. Corr. Inst.*, 966 F.3d 474, 479–80 (6th Cir. 2020) (explaining that sufficiency-of-the-evidence and preponderance standards are higher than *Brady*'s reasonable probability standard); *Bailey v. Rae*, 339 F.3d 1107, 1118 (9th Cir. 2003) (holding that preponderance interpretation is contrary to "reasonable probability" standard).

For Fifth Circuit precedent permitting a preponderance standard as "shorthand" for the reasonable-probability standard, the district court invoked *Charles v. Stephens*, 736 F.3d 380, 393 (5th Cir. 2013). ROA.2534. But two conditions had to be true before *Charles* permitted that "shorthand." First, the state court had "cited a number of Supreme Court cases applying the correct *Strickland* prejudice standard, including *Wiggins [v. Smith]*, 539 U.S. 510 [(2003)], *Rompilla [v. Beard]*, 545 U.S. 374 [(2005)], and *Williams [v. Taylor]*, 529 U.S. 362 [(2000)]." *Charles*, 736 F.3d at 393. Second, the state courts had made clear that "the [records at issue] would have provided no value to" the mitigation case. *Id.* Here, by contrast, the state court simply stated that "Applicant has

37

failed to meet his burden under [*Strickland*]"—without any of the extensive citation animating the result in *Charles*. *Ex parte Rubio*, 2018 WL 2329302, at \*3. Moreover, the TCCA opinion does not (and could not) suggest that the mitigating value of the FASD evidence was zero.

Secondarily, the district court held that the TCCA's mistaken preponderance standard can be ignored because the *trial court* recited the appropriate prejudice standard. Whatever one might say about the district court's reasoning when an appellate opinion is silent as to a standard, the presence of a correctly formulated legal standard in a recommendation cannot trump the appellate opinion that affirmatively articulates that very standard incorrectly. The case law on § 2254(d) permits federal courts to "look through" the TCCA decision only when the TCCA was silent on the standard. *See Wilson v. Sellers*, 584 U.S. 122, 125 (2018) ("[W]hen the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion . . . , a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable. We have affirmed this approach time and again.") *Ylst v. Nunnemaker,* 501 U.S. 797, 806 (1991)

(permitting federal courts to "look through" to lower state-court opinions only where the supreme court opinion is "unexplained").

Although a § 2254(d) inquiry may look through to lower state court decision for some claims and not for others, it cannot look through to a junior state court decision for an alternate rationale on a claim that the senior court reached on the merits. *See Lucio v. Lumpkin*, 987 F.3d 451, 465 (5th Cir. 2021) (explaining that look through applies on a claim-by-claim basis, not within claims); *Woodfox v. Cain*, 772 F.3d 358, 369 (5th Cir. 2014) (looking through only once a federal court determines that the senior state court failed to "issue[] a reasoned opinion"); *Steward v. Cain*, 259 F.3d 374, 378 (5th Cir. 2001) (explaining that look-through doctrine does not apply to a claim once a senior court reaches the merits of that claim). In short, a federal court does not assemble a hypothetical state-court rationale by stitching together different pieces of the TCCA and trial court opinions.

Setting aside the contrary-to problem, the TCCA also applied the prejudice standard unreasonably in the particulars. Specifically, it determined that the "heinous nature of the crime" zeroed out any risk of prejudice. *Ex parte Rubio*, 2018 WL 2329302, at *3. The TCCA's narrow

focus on the "heinous nature of the crime" fails to properly consider mitigation that counsel failed to develop and therefore violates clearly established federal law. *See Williams*, 914 F.3d at 319 (finding that the state decision on FASD claim was legally unreasonable because it "failed to examine the facts of this case in view of the *Strickland* requirements and instead made a generalized assessment unrelated to the case before it").

The cornerstone Supreme Court cases finding prejudice from deficient mitigation investigation—including scenarios where the investigation omitted exploration of fetal alcohol exposure—make it clear that relief can be appropriate even in highly aggravated cases. *See, e.g.*, *Sears*, 561 U.S. at 945 (finding prejudice where defendant had kidnapped, raped and murdered his 59-year-old victim after punching her in the face with brass knuckles and handcuffing her in the backseat of a car); *Rompilla*, 545 U.S. at 378, 390, 392–93 (finding prejudice where omitted evidence of fetal alcohol exposure would have been presented alongside aggravating evidence that "the murder was committed by torture" and where the evidence of danger was "simply overwhelming"); *Williams*, 529 U.S. at 362 (finding that the no-prejudice finding triggered

§ 2254(d)(1) even where the claimant had brutally killed his victim with a mattock after the victim refused to lend him a couple of dollars, and where the claimant's prior assaults included an elderly woman left in a vegetative state).

The state courts also determined that there could be no prejudice because FASD evidence might be double-edged, and that it could have therefore exacerbated the case on dangerousness. ROA.44839-40. Specifically, the State Findings determined that, because "persons with FASD have problems with judgment and impulsivity that accounts, in part, for a markedly increased lifetime incidence of problems with the law," this evidence would have suggested future danger. ROA.44839. The State Findings used this reasoning to write off the three post-conviction experts who testified about the impact that evidence of FASD would have had on the jury. ROA.44841. In this respect, too, the State Findings contain an objectively unreasonable explanation for the effect that FASD would have in this case—and the district court decision to the contrary is debatable.

The state court reasoning reads as though evidence about ongoing "problems with judgment and impulsivity" was not all over the record,

with the implication being that the investigation of FASD evidence introduced some increment of defense vulnerability. But the punishment phase was already about those very impairments. *See Williams*, 914 F.3d at 319 (holding that state prejudice determination was unreasonable because "the mitigating FAS evidence here could have been significant for the jury because it could have established cause and effect, thereby diminishing Williams' culpability"). What the omission of FASD investigation actually did was leave the trial team unable to coherently explain Rubio's behavior and symptomatology, thereby leaving Rubio vulnerable to Dr. Welner's general assertion that Rubio was faking his impairments. *See, e.g.*, ROA.35128, 35135.

Finally, the district court's prejudice holding is debatable because its § 2254(d)(1) inquiry elides the separated form of Texas capital sentencing inquiry—balancing omitted mitigation against evidence of future danger. ROA.2534. Texas requires a sentencing‑phase jury to give *separate* answers to questions about future dangerousness and mitigation. In other words, even if a Texas jury has already found a person convicted of capital murder to be a future danger, jurors may still answer the mitigation question in a way that would require the judge to

42

impose a life sentence. In Texas, future dangerousness is not weighed against mitigation.

## II. This Court should certify for appeal Rubio's claim that his Sixth Amendment right to counsel was violated because the defense failed to investigate and prepare for his insanity defense.

Rubio has litigated an "IATC-Guilt" claim alleging that trial counsel was prejudicially deficient in failing to adequately investigate and prepare an insanity defense at the guilt phase of his trial. ROA.1916-30. He seeks a COA on this claim. The underlying merits are debatable, as is the district court's procedural ruling.[9]

### A. Reasonable jurists could debate the claim's underlying merit.

Rubio's IATC-Guilt claim "deserve[s] encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citation omitted). An IATC claimant must prove deficient representation and prejudice

---

[9] In his petition, Rubio raised a claim that trial counsel was ineffective at the guilt phase of trial by failing to adequately prepare an insanity defense (Claim 3). The claim alleged that trial counsel failed to prepare their insanity experts and failed to investigate and present prison records supporting Rubio's severe mental illness, prejudicing the guilt phase of trial. ROA.1916-30. Rubio also raised a claim pertaining only to trial counsel's ineffectiveness in failing to investigate and present the prison records and alleging that the deficiency prejudiced both the guilt and punishment phases of trial (Claim 7). ROA.1967-73. In its resolution of the claims, the district court divided its analysis of the issues to address the insanity experts under Claim 3 and the prison records under Claim 7. ROA.2555 n.14. In this Motion, Rubio adopts the district court's approach and combines the allegations.

therefrom. *See Strickland*, 466 U.S. at 687. Rubio's trial counsel ineffectively litigated guilt in at least two ways: (1) they failed to adequately prepare their experts to support an insanity defense; and (2) they failed to investigate and present Rubio's TDCJ records documenting his history of severe mental illness.

The central guilt-phase issue was whether Rubio was sane at the time of the offense. There is significant evidence that he was not. He had an extensive history of mental illness, and, at the time of the crime, he was hallucinating and experiencing delusions. Trial counsel, however, failed to adequately investigate and prepare Rubio's insanity defense.

### 1. Reasonable jurists could debate whether trial counsel's preparation for the guilt phase was deficient.

To establish deficient performance, "a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.'" *Wiggins*, 539 U.S. at 521 (2003) (quoting *Strickland*, 466 U.S. at 688). Trial counsel have a duty to undertake a reasonable investigation into the case. *See Wiggins*, 539 U.S. at 521; *Strickland*, 466 U.S. at 690–91. Under prevailing professional norms, counsel should retain and prepare experts, and they should request and review records

related to the client—including medical and correctional records. *See ABA Guidelines*, Guideline 10.7 at cmt; *id.* at Guideline 10.11(F)(2); *Guidelines and Standards for Texas Capital Counsel*, State Bar of Texas (2006), Guidelines 10.1(B)(2)(b), 11.1(A)(3)(b); *see also Rompilla*, <u>545 U.S. 374, 390</u> (2005) (discussing the importance of investigating prior incarceration records).

### a. Failure to prepare insanity experts.

The first aspect of trial counsels' deficiency was a failure to prepare its insanity experts, to whom trial counsel gave the wrong definition of insanity. To prevail on an NGRI defense, Texas law required Rubio to show that he did not know his conduct was "legally wrong." <u>Tex. Penal Code § 8.01</u>; *Bigby v. State*, <u>892 S.W.2d 864, 878</u> (Tex. Crim. App. 1994). This standard differs from the "morally wrong" standard used in other jurisdictions. *See* <u>ROA.2552</u>.

Rubio presented two experts to support his insanity defense: Dr. Raphael Morris and Dr. William Valverde. During both examinations, it became clear that trial counsel had asked the experts to assess Rubio under wrong insanity standard, and that trial counsel had therefore

withheld from those experts critical evidence relevant to the *Texas* NGRI definition. ROA.1917-18.

The experts labored under the mistaken standard throughout the representation. They applied the "morally wrong" standard in their reports. ROA.22524. They then testified broadly that Rubio lacked awareness that his actions were wrong, but their testimony revealed that they remained unaware that Texas used a "legally wrong" standard. ROA.22396-98, 22492-94. On cross-examination, the State obliterated Dr. Morris's credibility by underscoring his failure to evaluate Rubio under the correct forensic standard. ROA.22524-26.

The State further highlighted that trial counsel had not provided the experts with critical evidence regarding Rubio's state of mind at the time of the crime. *See, e.g.*, ROA.22424-26 (Dr. Valverde unaware of testimony that Rubio claimed to know how to commit the "perfect crime" by feigning insanity); ROA.22428-29 (Dr. Valverde did not review statements made by co-defendant Angela Camacho); ROA.22537 (Dr. Morris unaware of Camacho's claims that Rubio had previously talked about killing the children); ROA.22535, 22561 (Dr. Morris unable to speak with critical witness, Jose Moreno); ROA.22570 (Dr. Morris unable

to review Dr. Welner's recorded interview with Rubio). As a result, Dr. Morris and Dr. Valverde scrambled to salvage their NGRI opinions as they encountered critical evidence for the first time on the witness stand.

In the end, and even though insanity was the only meaningful guilt-phase issue, counsel failed to present a single credible witness to testify that Rubio was insane under the Texas standard. Information necessary to prepare their experts was readily available. Not only would such preparation have allowed the experts to provide a reasonably informed opinion on direct examination, but it also would have helped the experts survive a cross examination that systematically attacked the information deficits.

The district court, however, found that trial counsel adequately prepared their experts. First, the court noted that trial counsel should have been aware of the correct insanity standard. *See* ROA.2552 ("the TCCA's ruling provided guidance for trial counsel to fashion a[n] [insanity] defense in the second trial"). But a holding that trial counsel should have known the right insanity standard supports a finding of deficiency, not of adequate performance. *See Hinton v. Alabama*, 571 U.S.

263, 274 (2014) (trial counsel's misunderstanding of law, in the face of statutory clarity, supported a finding of deficient performance).

The district court further stated that counsel "demonstrated their correct understanding of Texas' insanity defense throughout the trial." ROA.2552. In support, the district court reasoned that trial counsel did not object when the State selected a jury using the right NGRI standard and it pointed to vague exchanges with defense experts to "demonstrate[] that [Dr. Morris and Dr. Valverde] understood the correct legal standard." ROA.2552-53.

Reasonable jurists could debate whether the transcript content that the district court cites establishes that either counsel or the defense experts were using the correct insanity standard. For example, the prosecutors argued to the jury in closing that Dr. Morris applied the incorrect standard and the Director conceded as much in the district court. *See* ROA.2136. And, ultimately, the district court concluded that the expert "made differing statements" about the forensic standard that applied. *See* ROA.2554. The district court's finding on this score is debatable because it is flatly wrong.

The district court failed to meaningfully engage with allegations that trial counsel prepared its experts with the wrong definition of insanity, and that trial counsel withheld crucial evidence accordingly. Instead, the district court separated those allegations from the rest of the guilt-phase allegations, and then held that the expert preparation, in isolation, did not have a reasonably probable effect on the outcome. *See* ROA.2551, n.13 (stating the allegations were "unrelated to the main thrust of [Rubio's] claim"). Sometimes referred to as "claim-splitting," what the district court did treats each allegation of deficiency as a distinct claim with a separate, diluted prejudice analysis. This practice contravenes *Strickland*'s instruction to take a "totality" approach when assessing an ineffectiveness claim. *See Strickland*, 466 U.S. at 681, 695; *see also Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (holding that *Brady* materiality inquiry is cumulative); *id.* at 434 (holding that *Brady* materiality inquiry is the same as *Strickland* prejudice inquiry). Reasonable jurists could debate whether the district court's "claim-splitting" constitutes legal error.

### b. Failure to investigate TDCJ records documenting history of mental illness.

Even though mental health was the central trial issue, trial counsel also failed to investigate and present highly probative information documented in TDCJ and county jail records. *See* ROA.1919. Those records, which capture the progression of Rubio's mental illness, span from 2003 until his retrial in 2010. They show that Rubio was heavily medicated for severe mental illness, and that he took antipsychotics including Thorazine (chlorpromazine) and Risperdal (risperidone), antidepressants Prozac (fluoxetine) and Wellbutrin (bupropion), and the antianxiety medication Vistaril (hydroxyzine). The prescriptions are reflected across more than one hundred entries in the records, spanning the seven years between Rubio's two trials.

Rubio was prescribed an incredible array of medication, and he complied with the regimen. The prison recorded each time Rubio was offered medication and each time he took it. Those records indicate that the prison viewed medication compliance—typically between 70 and 100 percent—as one of Rubio's strengths.[10] The records also provide

---

[10] *See, e.g.,* ROA.1312, 1331, 1344, 1361, 1367, 1380, 1383, 1425, 1432, 1439, 1454, 1463, 1472, 1476, 1486, 1487, 1489, 1493, 1499, 1500, 1503, 1508, 1511, 1517, 1518, 1525, 1529, 1538, 1543, 1551, 1558, 1561, 1566, 1570, 1574, 1580, 1586, 1588, 1607.

consistent insight into Rubio's contemporaneous appearance and behavior. TDCJ staff noted that Rubio continued to report hallucinations and delusions, and that he exhibited a cycle of behavior consistent with schizoaffective disorder (ultimately diagnosed by TDCJ). *See* ROA.685, 699, 721.

These records were readily available to counsel. Moreover, they would have rebutted a core premise of the State's sanity case, as presented through their expert Dr. Michael Welner—that Rubio neither experienced symptoms of, nor took medicine for, mental illness. ROA.23257-60. Trial counsel's failure to adequately obtain and use the records was deficient performance.

The district court concluded that trial counsel made a "reasonable strategic decision" not to utilize the TDCJ records but did not cite to any statements by trial counsel to this effect. ROA.2560. Instead, the court suggested that counsel may have strategically chosen not to use the records, by which it seemed to mean present the records themselves as evidence. The district court offered several hypothetical reasons: (1) the records would open the door to expert evidence that Rubio refused medication, (2) the records contained self-reported evidence of Rubio's

51

psychosis, and (3) the records would not have undermined Dr. Welner's testimony because he claimed to have reviewed them. *See* ROA.2558-59.

Reasonable jurists could debate each of these points because the district court's hypothesized reasons for ignoring these records do not withstand any scrutiny. The TDCJ records—kept by a reasonably neutral health provider in the regular course of business years before Rubio's re-trial—include nearly 40 entries documenting Rubio's commendable medication compliance, and neither defense expert appears to have received the records before drafting their reports. *See* ROA.1209 (indicating the records were not collected by counsel until the day before the start of the 2010 competency trial, months after the Martinez and Morris reports were signed). The expert testimony therefore tends to *prove prejudice*, not *undermine deficiency*. Moreover, the records indicate that TDCJ took Rubio's symptoms of psychosis seriously. TDCJ not only prescribed a striking antipsychotic regimen, but it also referred him to the space-limited Jester-IV psychiatric unit and diagnosed him with schizoaffective disorder. ROA.699, 705. Finally, the possibility that Dr. Welner reviewed these records before testifying—that Rubio was neither medicated nor showing symptoms of mental illness in the years before

the retrial—only strengthens the argument that effective counsel would have confronted him about the hundreds of entries that Dr. Welner apparently ignored. *See also* Part III, *infra* (Dr. Welner False Testimony).

### 2. Reasonable jurists could debate whether the deficiencies prejudiced Rubio.

Reasonable jurists could debate whether trial counsel's deficient representation—including the failure to prepare experts and properly use records—prejudiced the NGRI verdict. The same prejudice rules recited for the IATC-FASD claim apply here, meaning that Rubio must show only a reasonably probable effect on the trial outcome. *See Strickland*, 466 U.S. at 698.

Trial counsel's deficiency meant that not a single defense expert testified that Rubio was insane under the elevated Texas standard. The jury was well aware that: Rubio's experts were diagnosing Rubio under a standard that was lower than what Texas law required, ROA.22398, 22524; that the experts did not review critical information related to Rubio's state of mind at the time of the crime, ROA.22425, 22428-29, 22535, 22537, 22561, 22570; that one expert, Dr. Morris, admitted that this critical information "might have" affected his professional opinion had he reviewed it, ROA.22536; and that the two defense experts did not

even agree on whether Rubio understood the consequences of his actions at the time of the offense, ROA.22525. No juror could credit the testimony of either expert under these circumstances, and trial counsel's failure to prepare their insanity experts prejudicially undermined the guilt-phase outcome.

The district court concluded that Rubio failed to show "that had the jury not heard the competing testimony based on a 'morally wrong' standard, it would have found him not guilty by reason of insanity." ROA.2555. The court continued, "On the contrary, the jury also heard ample evidence based on the correct 'legally wrong' standard, and chose not to accept it." ROA.2555. Reasonable jurists could debate this conclusion. The district court acknowledges that Rubio's *own experts* provided "competing testimony" on the critical question presented to the jury. Although the district court ultimately concluded that this was not prejudicial, it did not cite to any of the "ample evidence" that jury allegedly heard regarding the correct forensic standard and reasonable jurists could debate the conclusion. Further, the district court again ignored the prejudice that arises from counsel not providing their experts

with critical evidence related to Rubio's knowledge of the illegality of his actions.

In addition to counsel's failure to prepare the insanity experts, Rubio was further prejudiced at the guilt phase by counsel's failure to timely investigate and present seven years and hundreds of pages of prison records documenting symptoms of, and treatment for, severe mental illness. At trial, Dr. Welner falsely testified that, for the vast majority of Rubio's time between the two trials, Rubio was un-medicated and exhibited no signs of severe mental illness. *See* ROA.23258. Dr. Welner's testimony went largely unimpeached, and the State highlighted it numerous times at closing arguments. ROA.23383-84, 23387, 23424-25, 23428-29, 23432-33, 23436. Ultimately, the jury concluded that it would not deliver an NGRI verdict. Had defense counsel made timely use of the TDCJ records—which disclosed a robust antipsychotic regimen and substantial mental-health struggles—there is a reasonable probability that a juror would have made a different NGRI finding.

The debatability of the district court's decision also traces to an abstract point of law. The district court refused to find prejudice because Rubio "does not demonstrate that the prison records would have

*significantly shifted* the balance of that evidence in the jury's mind." ROA.2560 (citing *Druery v. Thaler*, 647 F.3d 535, 541–42 (5th Cir. 2011)) (emphasis added). Reasonable jurists could debate whether the "significant-shift" framing of the IATC prejudice standard is higher than what *Strickland* requires. *Compare Strickland*, 466 U.S. at 694 (establishing the "reasonable probability" test for IATC claims).

The district courts disposition of the claim is debatable in its specifics, too. The district court concluded that the prison records supported both sides of the insanity issue, and so the failure to investigate and present them was nonprejudicial. ROA.2560. But *nothing* in the records support the State's categorical trial position that Rubio (1) had no symptoms of mental illness and (2) was unmedicated during that time. Whatever else one might say about the records and trial counsel's investigation thereof, they were not a net benefit for the State.

## B. Reasonable jurists could debate whether default is excused.

The IATC-Guilt claim is exhausted and procedurally defaulted. Rubio presented this claim in his 2021 subsequent state habeas application. ROA.2535-36. The TCCA found that the application "failed to satisfy the requirements of Article 11.071, § 5(a)" and dismissed it

56

"without considering the claims' merits." *Ex parte Rubio*, 2022 WL 221485, at \*3.

Initial state post-conviction counsel deficiently failed to raise this claim, so reasonable jurists could debate whether, under *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), default is excused. Under *Martinez* and *Trevino*, default of a substantial IATC claim is excused if it was forfeited because of deficient state post-conviction representation. *See Trevino*, 569 U.S. at 417; *Martinez*, 566 U.S. at 17. Here, state habeas counsel provided a sworn declaration stating that he neither investigated nor even considered the IATC-Guilt claim. ROA.1625. He further declared that, had he been aware of the contents of the TDCJ records, he would have considered the claim substantial enough to raise in the initial application. ROA.1625. He identified no strategic reason for omitting the claim.

The district court, however, concluded that Rubio could not excuse default by under *Martinez*. ROA.2556, 2561-62. In support, it relied on its determination that the underlying IATC-Guilt claim is not substantial and concluded that "Rubio fails to demonstrate that the omission of [this claim] was anything other than a strategic decision not to advance a weak

argument." ROA.2561. Given that state habeas counsel produced a sworn declaration stating that he believed the claim was substantial but overlooked it, reasonable jurists could debate the district court's conclusion that state habeas counsel made a strategic decision "not to advance a weak argument."[11]

## III. This Court should certify for appeal Rubio's claim that the State violated his right to due process under *Napue v. Illinois.*

In Claim Six of his Second Amended Petition, Rubio alleged that the prosecution violated due process by eliciting expert testimony regarding Rubio's mental health, and that it knew or should have known that the testimony was false. ROA.1957-67. He seeks a COA on this claim.

### A. Reasonable jurists could debate the claim's underlying merit.

A conviction obtained through false testimony elicited by the State violates due process when the State knew or should have known that it was false. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959) (citing *Alcorta v. Texas*, 355 U.S. 28 (1957)). The State must avoid presenting misleading

---

[11] Because the district court did not rely on § 2254(e)(2) in its denial of this claim, Rubio does not address it. If the Director asserts § 2254(e)(2) as alternative grounds for affirmance, then Rubio reserves the right to answer such an argument in his Reply.

evidence, and it must correct any "false impression" that elicited testimony leaves. *See Napue*, 360 U.S. at 269; *Alcorta*, 355 U.S. at 31. To establish a *Napue* claim, a claimant must prove: (1) the falsity of a witness statement; (2) the State's culpable elicitation or failure to correct it; and (3) materiality. *United States v. Dvorin*, 817 F.3d 438, 451–52 (5th Cir. 2016).

Rubio alleged a substantial claim based on the prosecution eliciting false testimony from Dr. Welner. Dr. Welner falsely testified (1) that Rubio was not taking antipsychotic medications while incarcerated and (2) that Rubio did not exhibit symptoms of psychosis before his second trial. The State relied extensively on Dr. Welner's testimony at both guilt and sentencing phases of the trial.

### 1. Reasonable jurists could debate whether the State knowingly elicited false testimony from Dr. Welner.

At the trial's guilt phase, the State called Dr. Welner to rebut Rubio's insanity defense. Dr. Welner testified falsely that Rubio was not on antipsychotic medication for the "great majority" of time between his arrest and the 2010 trial, and he testified falsely that Rubio exhibited no symptoms of psychosis during that time. Linking those different pieces of false testimony, Dr. Welner told the jury that Rubio could not have

been psychotic because a psychotic person who lived in prison and lacked

medication would exhibit symptoms of psychosis:

> He has not been on medication. There is a brief period in which
> he was on anti-psychotic medications which Doctor Valverde
> prescribed. But we are talking seven years, and the great
> majority of the time he has not been on anti-psychotic
> medications. . . . And for schizophrenia, chronic schizophrenia,
> an unmedicated chronic schizophrenic would not be able to
> maintain that intact presentation for such a sustained period
> of time. . . . In other words, if they are brittle, that's a setting
> in which they crumble unless they are medicated. He has been
> unmedicated in these settings and he hasn't crumbled.
> Furthermore, this violent episode hasn't been replicated in
> custody to this degree or to any remote degree.

ROA.23257-60. The factual premises that Dr. Welner advanced in his

testimony were false. As set forth above, Rubio's TDCJ records show (1)

that he was in fact heavily medicated with antipsychotics, and (2) that

he suffered symptoms of severe mental illness in between trials. *See*

ROA.212-55; *see supra*, IATC-Guilt Claim.

The district court found that Dr. Welner's testimony was not false,

ROA.2574, and reasonable jurists could debate that conclusion because

it is wildly inconsistent with the evidence. First, Rubio *was in fact* heavily

dosed with anti-psychotic medications during the seven years before his

2010 trial. He was put on medication about a month after the crime and

he remained medicated while he awaited his first trial. As early as April

2003, Rubio was prescribed anti-psychotic medication and other anti-depressants. ROA.808; *see also* ROA.212 (Rubio reporting that Dr. Valverde prescribed him Prozac). Rubio continued receiving anti-psychotic medications in 2004, when he was sent from Polunsky Unit to Jester-IV. ROA.219. Rubio continued to take anti-psychotic medications throughout 2006 and 2007, upon his return to Polunsky. TDCJ records from 2006 highlight not only that Rubio was prescribed chlorpromazine (Thorazine) and bupropion (Wellbutrin), but also that he took most of his medicine. ROA.243, 252; *see also* ROA.687 (listing Rubio's "strong med. compliance" as one of his strengths). After Rubio's first conviction was reversed, he continued to take anti-psychotic medication. Jail records indicate that, leading up to his 2010 trial, Rubio was again taking Wellbutrin and Vistaril. ROA.663. Rubio's records reflect that the jail discontinued these medications on the same day that Dr. Welner met with Rubio. ROA.663.

Second, Dr. Welner's testimony was false—and the district court's *Napue* disposition was debatable—because Rubio *did in fact* exhibit symptoms of psychosis. The TDCJ Health Records include over 100 entries documenting symptoms of severe mental illness. For example,

even though he had been "on meds for 'years'" and even though he was in ongoing compliance with his doctor's instructions, Rubio continued to experience numerous visual and auditory hallucinations. ROA.211, 243. The prescribed medications alleviated his hallucinations but did not eliminate them. ROA.736; *see* ROA.665, 667.

As to Dr. Welner's testimony about the medication and Rubio's medicated condition, reasonable jurists could debate the district court's finding of non-falsity. The district court stated that the TDCJ records contain merely "controverting evidence" that Rubio refused to take medications and "feigned symptoms." ROA.2574. The district court therefore reasoned that Rubio's mental health records were merely "common impeachment evidence." Irrespective of whether the records could also be used to impeach Dr. Welner, they *also* go to the truth of the underlying testimony—Dr. Welner testified falsely that Rubio exhibited no symptoms of psychosis. The records showed that Rubio was actually taking anti-psychotic medications, experiencing hallucinations, and exhibiting other symptoms of severe mental illness. The records describing Rubio's condition were routine entries completed by a neutral party years prior to his trial, leaving no reason for Dr. Welner to doubt

their accuracy. His testimony about the conditions those records captured
was false.

> **2.      Reasonable jurists could debate whether the
> State knew, or should have known, that Dr.
> Welner's testimony was false.**

The State knowingly elicited this false testimony from Dr. Welner
and failed to correct what they knew or should have known to be false.
They knew or should have known that the testimony was false because
they possessed the records at issue. In fact, Dr. Welner *expressly stated*
that he reviewed all records provided by the State, which include the
records at issue here. ROA.23176-77. Under the circumstances,
reasonable jurists could debate the district court's conclusion that the
State elicited testimony from Dr. Welner that it neither knew nor should
have known to be false. ROA.2575 n.17 ("As a final deficiency, Rubio does
not demonstrate that the State knowingly elicited any false testimony
from Dr. Welner."). The State gave the records to Dr. Welner, so it either
knew or should have known that he misrepresented their content.

> **3.      Reasonable jurists could debate whether Dr.
> Welner's false testimony was material.**

The prosecution relied heavily on Dr. Welner's false testimony to
secure Rubio's conviction and sentence. Notwithstanding the pivotal

nature of Dr. Welner's testimony, the district court concluded that Rubio fell short of showing that the statements by Dr. Welner were material. ROA.2575. That is, at the very least, debatable. Dr. Welner's testimony was material because his false testimony "could . . . in any reasonable likelihood have affected the judgment of the jury." *Giglio*, 405 U.S. at 153–54 (quoting *Napue*, 360 U.S. at 271). Even if many *witnesses* testified about Rubio's mental health before the trial jury, Dr. Welner was the only *State expert* who testified.[12] And Dr. Welner repeatedly emphasized false testimony that left the jury with a deeply misleading picture of Rubio's mental health. Moreover, Dr. Welner's testimony directly affected both the jury's guilt-phase NGRI finding and its sentencing-phase mitigation finding. Accordingly, reasonable jurists could debate the district court's conclusion that Dr. Welner's testimony was immaterial.

## B. Reasonable jurists could debate the district court's procedural ruling on Rubio's false testimony claim.

The false testimony claim is procedurally defaulted. Rubio presented this claim in his 2021 subsequent state habeas application. ROA.41923-2101. The TCCA found that the application "failed to satisfy

---

[12] Different experts testified to a different jury for the competency phase.

the requirements of Article 11.071, § 5(a)" and dismissed it "without considering the claims' merits." *Ex parte Rubio*, 2022 WL 221485, at \*3. However, the federal court can still reach the merits of the claim under the "miscarriage of justice" exception. The district court concluded that Rubio could not meet the exception, but that conclusion is debatable.

Reasonable jurists could debate whether the procedural default of this claim is excused under the miscarriage of justice exception—as to both Rubio's conviction and death sentence. *See House v. Bell*, 547 U.S. 518, 538 (2006) (recognizing miscarriage-of-justice gateway for guilt); *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992) (same for death sentence). That exception is satisfied both because Dr. Welner's testimony had a sufficiently likely impact on the guilt finding (sanity) and because it had a sufficiently likely impact on the punishment determination. The miscarriage-of-justice standard approximates an actual-innocence inquiry requiring a "holistic judgement about all the evidence" and "its likely effect on reasonable jurors applying the reasonable-doubt standard." *House*, 547 U.S. at 539 (internal quotations removed) (citing *Schlup v. Delo*, 513 U.S. 298, 328 (1995)).

As explained both above and in the Second Amended Petition, the impact of Dr. Welner's false testimony corrupted all fact-finding pertaining to mental health, which was keyed to the false proposition that Rubio's presentation was inauthentic. In other words, Dr. Welner's testimony reverberated throughout the trial, touching every piece of mental health information litigated at both the guilt and punishment phases of the case. Rubio satisfies two different gateways, one associated with each phase.

The district court concluded that Rubio could not overcome the procedural bar and satisfy the miscarriage of justice exception. ROA.2573-75. However, absent the due process violation of eliciting false testimony from Dr. Welner, no reasonable juror would find that Rubio was sane at the time of the offense and therefore guilty. Rubio also satisfies the miscarriage of justice exception because without Dr. Welner's false testimony, no reasonable juror would have found Rubio eligible for death at the punishment phase. Under the circumstances, reasonable jurists could debate the district courts procedural conclusion that Rubio did not satisfy the miscarriage of justice exception.

## CONCLUSION

This Court should certify these claims for appeal.

Respectfully submitted,

*/s/ Jeremy Schepers*
Jeremy Schepers
Supervisor, Capital Habeas Unit
jeremy_schepers@fd.org

*/s/ Derek VerHagen*
Derek VerHagen
Assistant Federal Public Defender
derek_verhagen@fd.org

*/s/ Claire Davis*
Claire Davis
Assistant Federal Public Defender
claire_davis@fd.org

Office of the Federal Public Defender
Northern District of Texas
525 South Griffin Street, Ste. 629
Dallas, Texas 75202
214.767.2746
214.767.2886 (fax)

*/s/ Lee Kovarsky*
Lee Kovarsky
*Special Counsel*

Phillips Black, Inc.
A Non-Profit Law Practice
727 E. Dean Keeton Street
Austin, Texas 78705
434.466.8257
l.kovarsky@phillipsblack.org

## CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2024, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Fifth Circuit using the CM/ECF system.

*/s/ Jeremy Schepers*
Jeremy Schepers


## CERTIFICATE OF COMPLIANCE

I certify that (1) this document was prepared in 14-point Century Schoolbook font using Microsoft Word software, (2) this document is 12,899 words, excluding the portions exempted by the rules of this Court, and (3) this document has been scanned for viruses and is virus-free. Counsel further certifies that any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13.

*/s/ Jeremy Schepers*
Jeremy Schepers